**STATE OF VERMONT
SUPERIOR COURT
WASHINGTON UNIT**

| | |
|---|---|
| STATE OF VERMONT, | ) CIVIL DIVISION |
| Plaintiff | ) Docket No. 352-5-13 Wncv |
| | ) |
| v. | ) |
| | ) |
| MPHJ TECHNOLOGY INVESTMENTS, LLC | ) |
| Defendant | ) |

## CONSUMER PROTECTION COMPLAINT

### I.  Introduction

1.  The Vermont Attorney General brings this suit under the Vermont Consumer

Protection Act, 9 V.S.A. §§ 2451 *et seq.* in response to consumer fraud violations by

Defendant MPHJ Technology Investments, LLC.  Defendant has engaged in unfair and

deceptive acts by sending a series of letters to many small businesses and non-profit

organizations in Vermont.  The letters threaten patent litigation if the businesses do not

pay licensing fees. The Attorney General seeks injunctive relief, restitution and other

compensation to consumers, civil penalties, fees and costs, and other appropriate relief.

### II.  Parties, Jurisdiction and Related Matters

2.  Defendant MPHJ Technology Investments, LLC ("MPHJ Technology") is a

Delaware Limited Liability Company that claims to be located at 1220 North Market Street,

Ste. 806, Wilmington, Delaware 19801.  This is the address of Registered Agents Legal

Services, LLC, MPHJ Technology's registered agent in Delaware.

3.  MPHJ Technology operates in Vermont through forty wholly-owned shell

subsidiary companies: AbsMea, LLC; AccNum, LLC; AdzPro, LLC; BarMas, LLC; BetNam,

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

1

LLC; BriPol, LLC; BruSed, LLC; BunVic, LLC; CalLad, LLC; CalNeb, LLC; CapMat, LLC; ChaPac, LLC; CraVar, LLC; DayMas, LLC; DesNot, LLC; DreOcc, LLC; DucPla, LLC; ElaMon, LLC; EntNil, LLC; EquiVas, LLC; FanPar, LLC; FasLan, LLC; FolNer, LLC; FraMor, LLC; GimVea, LLC; GosNel, LLC; GraMet, LLC; HadOpp, LLC; HanMea, LLC; HarNol, LLC; HeaPle, LLC; InaNur, LLC; InkSen, LLC; IntPar, LLC; IsaMai, LLC; JamVor, LLC; JitNom, LLC; JonMor, LLC; JudPur, LLC; and JusLem , LLC (collectively, the "Shell LLCs"). Each of the Shell LLCs is a Delaware Limited Liability Company that claims to be located at 40 East Main Street, #19, Newark, Delaware 19711, a UPS Store.

4.   Jay Mac Rust, a Texas attorney, is the manager of MPHJ Technology. Calls from letter recipients to any Shell LLC are directed to Mr. Rust if there is a significant problem.

5.   Mr. Rust is also the signatory of every patent's "Exclusive License Agreement" between MPHJ Technology and each Shell LLC. He has signed each agreement on behalf of both MPHJ Technology and the Shell LLC.

6.   MPHJ Technology controls the operations of the Shell LLCs.

7.   At all times relevant to this Complaint, Defendant MPHJ Technology did business in Vermont and solicited payments from Vermont consumers through its wholly owned subsidiaries.

8.   The Vermont Attorney General is authorized under the Vermont Consumer Protection Act, 9 V.S.A. § 2458(b), to sue to enforce the Act's prohibitions on unfair and deceptive acts and practices in commerce.

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

9.   This Court has personal jurisdiction over Defendant and is the proper venue for this action, based on the unfair and deceptive letters sent, or otherwise authorized, by Defendant throughout Vermont, including in Washington County.

10. This action is in the public interest.

## III. Statutory Framework

11. The Vermont Consumer Protection Act, 9 V.S.A. § 2453(a), prohibits unfair and deceptive acts and practices in commerce.

12. Businesses are considered consumers under the Vermont Consumer Protection Act, except where the goods or services at issue are being resold by the business.

13. The acts described below, and summarized in paragraphs 14-54, constitute unfair and deceptive acts and practices in commerce.

## IV. Facts

14. Since September 2012, numerous Vermont small businesses have received letters from one of the Shell LLCs.

15. Defendant, acting through the Shell LLCs, has sent similar letters to hundreds or thousands of businesses outside Vermont.

16. One Vermont recipient of the letters was Lincoln Street, Inc., a Springfield, Vermont non-profit that operates on state and federal funding to bring home care to developmentally disabled Vermonters.  Another Vermont recipient was ARIS Solutions, a non-profit that provides fiscal agent services to Vermonters with disabilities to assist them with daily living tasks.

17. The letters allege potential infringement of MPHJ Technology's patents, and request that the recipients either purchase licenses or confirm that they are not infringing the patents. *See* Exs. A-C.

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

18. The patents that Defendant owns and that are referenced in these letters sent to Vermont businesses were previously the subject of litigation brought by the prior owner of the patents. Those lawsuits were voluntarily dismissed by the patent-holder prior to any determination of their validity. No court has ruled on the validity of the patents.

19. The earliest patent referenced in these letters was filed in 1998 and issued in 2001.

20. On information and belief, no attempt to enforce the patents occurred until 2012.

21. Exhibit A is a redacted copy of the first letter sent to targeted businesses.

22. The first letter began, "We have identified your company as one that appears to be using the patented technology."

23. The first letter further stated:

> You should know also that we have had a positive response
> from the business community to our licensing program. As you
> can imagine, most businesses, upon being informed that they
> are infringing someone's patent rights, are interested in
> operating lawfully and taking a license promptly. Many
> companies have responded to this licensing program in such a
> manner. Their doing so has allowed us to determine that a fair
> price for a license negotiated in good faith and without the
> need for court action is payment of [$900 – $1200] per
> employee.

24. The first letter demanded that if the recipient business did not believe it was infringing, it fill out a questionnaire and produce extensive and burdensome documentation to prove that it was not infringing. See Ex. A, p. 4, para 2.

25. Exhibit B is a redacted copy of the third letter in the series of letters sent to Vermont businesses.

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

4

26. Exhibit C is a redacted copy of a draft complaint sent to Vermont businesses with the second or third letter.

27. The second and third letters were sent by a Texas law firm, Farney Daniels LLP ("Farney Daniels"). The second and third letters state that Farney Daniels is sending the letters on behalf of the Shell LLC that sent the first letter.

28. These later letters claimed that, because the recipients did not respond to the first, or first and second, letters, it was reasonable to assume that the recipient was infringing the patents, and Defendant had therefore retained patent counsel.

29. Some businesses that have complained to the Attorney General never received the first or second letters, and only received a third letter that referred to the prior letters.

30. The second letter stated that Farney Daniels' representation can involve litigation, which could be avoided if the recipient were to respond in two weeks to discuss licensing the patents.

31. The third letter twice promised to bring litigation:

> [I]f we do not hear from you within two weeks from the date of this letter, our client will be forced to file a Complaint against you for patent infringement in Federal Court where it will pursue all of the remedies and royalties to which it is entitled. . . .
>
> [W]e must hear from you within two weeks of the date of this letter. Given that litigation will ensue otherwise, we again encourage you to retain competent patent counsel to assist you in this matter. (Emphasis in original).

32. The third letter, and sometimes the second letter, attached a draft complaint against the receiving business, naming the Shell LLC that sent the letter as the plaintiff. *See* Exhibit C.

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

33. Defendant states in the letters that it will target additional Vermont businesses as part of its "ongoing vigorous licensing program."

34. The three letters Defendant sent to Vermont businesses contain statements that are false, deceptive, and likely to mislead the businesses that received them.

35. On information and belief, Defendant performed little, if any, due diligence to confirm that the targeted businesses were actually infringing its patents prior to sending these letters.

36. Defendant targeted small businesses in commercial fields that were likely unrelated to patent law.

37. On information and belief, Defendant has not received a positive response from the business community to its licensing program.

38. Nationwide, only a tiny fraction of the businesses that have received these letters, not "many" or "most," have purchased licenses.

39. The actual average licensing fee negotiated by Defendant was less than $900.

40. A business that receives a letter from a law firm that mentions the possibility of litigation is reasonably likely to infer that the threat of potential litigation is real.

41. Neither Defendant nor any Shell LLC has filed a single lawsuit in Vermont or any other state.

42. Over 130 days have passed since Vermont businesses began receiving letters promising that they would be sued if they did not respond within two weeks.

43. On information and belief, at the time the third letters were sent, and Defendant's counsel promised to sue the recipient businesses, Defendant had not engaged

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

6

in any further investigation of the recipient businesses or determined that the businesses were actually infringing its patents.

44. At the time the letters were sent to Vermont businesses, Defendant had not retained local Vermont counsel, as would be needed to prepare for litigation in Vermont.

45. Obtaining an opinion from qualified patent counsel as to whether a patent is valid and whether a potential patent-infringement action is likely to succeed can cost thousands of dollars, and can exceed the cost of the requested licenses.

46. Even an unsuccessful patent-infringement action may cost the defendant in excess of $1-2 million if the defendant chooses not to settle.

47. In certain circumstances, defendants in patent litigation may be able to recover their costs from plaintiffs, but that requires first enduring the entirety of the litigation.

48. If the defendant in a patent lawsuit successfully moves for an award of fees and costs, but the plaintiff is an undercapitalized shell company, the defendant will not be reimbursed for the costs of litigation.

49. In the letters sent to Vermont businesses, each Shell LLC claimed to possess an exclusive license, which would permit it to enforce the patents against businesses within a specific geographic area and commercial field.

50. Each Shell LLC was actually assigned a combination of geographic and commercial fields that was identical to at least one other Shell LLC.

51. Given the overlapping assignments, the Shell LLCs do not possess exclusive licenses.

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

7

52. The Shell LLCs mostly targeted businesses in Vermont that were located outside the geographic regions in which the Shell LLCs claimed to be legally permitted to enforce the patents.

53. Despite the reasonable inference that counsel sending a letter threatening litigation has reviewed the case and found it meritorious in accordance with his or her professional and ethical obligations, on information and belief, that review did not take place.

54. Defendant acted in bad faith by sending these letters to Vermont businesses.

## V.  Cause of Action: Unfair and Deceptive Trade Practices

55. Plaintiff realleges and incorporates by reference herein each and every allegation contained in the preceding paragraphs 1 through 54.

56. Defendant engaged in unfair trade practices in commerce in violation of the Vermont Consumer Protection Act, 9 V.S.A. § 2453(a), including:

   a. Stating that litigation would be brought against the recipients, when Defendant was neither prepared nor likely to bring litigation;

   b. Using legal counsel to imply that Defendant had performed a sufficient pre-suit investigation, including investigation into the target businesses and their potentially infringing activities, that would be required to justify filing a lawsuit;

   c. Targeting small businesses that were unlikely to have the resources to fight patent-litigation, or even to pay patent counsel;

   d. Sending letters that threatened patent-infringement litigation with no independent evidence that the recipients were infringing its patents;

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

  e. Shifting the entire burden of the pre-suit investigation onto the small businesses that received the letters;

  f. Propounding burdensome information demands on any business that claimed not to infringe the patents; and

  g. Using shell corporations in order to hide the true owners of the patents, avoid liability, and encourage quick settlements.

57. Defendant engaged in deceptive trade practices in commerce in violation of the Vermont Consumer Protection Act, 9 V.S.A. § 2453(a), by making deceptive statements in the threatening letters which would likely lead consumers to believe the following:

  a. Defendant would sue the target businesses if they did not respond within two weeks;

  b. Defendant would sue the target businesses if they did not pay money;

  c. Defendant had a reasonable basis for identifying the target businesses as infringing its patents;

  d. Subsidiary Shell LLCs were exclusive licensees able to enforce the patents;

  e. Target companies were within the sending Shell LLC's alleged area of exclusivity;

  f. Defendant's licensing program had received a positive response from the business community;

  g. Many or most businesses were interested in promptly purchasing a license from Defendant;

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

9

h. Based on prior licensing agreements, the fair price of a license was between $900 and $1200 per employee;

i. Target businesses were receiving a third letter, which refers to two prior letters, when in many cases recipients had received no prior letters.

WHEREFORE Plaintiff State of Vermont requests judgment in its favor and the following relief:

1. A permanent injunction prohibiting Defendant from engaging in any business activity in, into or from Vermont that violates Vermont law.

2. A permanent injunction requiring Defendant to stop threatening Vermont businesses with patent-infringement lawsuits.

3. Full restitution to all Vermont businesses who suffered damages due to Defendant's acts.

4. Civil penalties of up to $10,000.00 for each violation of the Consumer Protection Act.

5. The award of investigative and litigation costs and fees to the State of Vermont.

6. Such other relief as the Court deems appropriate.

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

Dated: May 8, 2013

STATE OF VERMONT

WILLIAM H. SORRELL
ATTORNEY GENERAL

By: _____
Bridget C. Asay
Ryan Kriger
Assistant Attorneys General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Tel.  (802) 828-5500
basay@atg.state.vt.us
rkriger@atg.state.vt.us

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609



**Exhibit A**

# HarNol, LLC
40 East Main Street, #19
Newark DE 19711
866-320-8371
licensing@harnol.org



Re:

We are the licensing agent for certain U.S. patents listed below. We have identified your company as one that appears to be using the patented technology, and we are contacting you to initiate discussions regarding your need for a license. In this letter, we explain what the patents cover, how you likely have an infringing system, explain why a license is needed, and provide you the general terms for such a license. We also answer some frequently asked questions, as well as explain how you can determine whether you do have an infringing system that requires a license. We should note that we have written you with the understanding that you are the proper person to contact on behalf of ████████ If you are not the proper person to handle this matter on behalf of the company, please provide this letter to the proper person, and notify us so that we may update our records and contact them directly in the future.

To turn to the matter at hand, the patents for which we are the licensing agent are listed below. The list includes both issued U.S. patents, as well as a patent application which is expected to issue in the future as an additional U.S. patent.

1. U.S. Pat. No. 7,986,426 ("Distributed Computer Architecture And Process For Document Management");
2. U.S. Pat. No. 7,477,410 ("Distributed Computer Architecture And Process For Virtual Copying");
3. U.S. Pat. No. 6,771,381 ("Distributed Computer Architecture And Process For Virtual Copying");
4. U.S. Pat. No. 6,185,590 ("Process And Architecture For Use On Stand-Alone Machine And In Distributed Computer Architecture For Client Server And/Or Intranet And/Or Internet Operating Environments"); and
5. 13/182,857 filed July 14, 2011 ("Distributed Computer Architecture And Process For Document Management").

You can find and review each of the issued patents listed above at www.google.com/patents.

As you may know, a patent's scope is defined by its claims, and you will see that each of the above-listed patents have different claims. While those differences matter and mean each patent is distinct, the patents listed above do, as a group, generally relate to the same technology field, and cover what at the time was a groundbreaking distributed computer architecture and process for digital document management. An illustrative embodiment of the architecture of the patents is provided in Figure 28, which is reproduced here for your reference.



Fig. 28

A good example of an infringing system, and one your company likely uses, is an office local area network ("LAN") which is in communication with a server, employee computers having email software such as Outlook or Lotus, and a third-party scanner (or a multi-function printer with scanning functionality) which permits the scanning of a document directly to employee email address as a pdf attachment. Such a system would be a typical example of what infringes. There are other examples listed further below.

We note here that the scope of the patents is technically defined by the claims, and the language of the claims defines the legal scope of the patents. The more generalized examples provided in this letter are for your convenience and should not be considered exact substitutes for the more detailed claims. As such, you may find it useful to consider, as illustrative examples, claims 1-5 of the '426 Patent. Reviewing those you can see that the patent claims are directed to a system having a digital copier/scanner/multifunction device with an interface to office equipment (or to the web) and related software, for scanning or copying and transmitting images electronically to one or more destinations such as email, applications or other local files. Coverage of this type of system, and of the more generally worded example in the previous paragraph, is further reflected in claims 1, 8 and 15 of the '410 Patent, claims 12 and 15 of the '381 Patent, and claims 9 and 16 of the '590 Patent. Obviously each claim is separately drafted and you should consider the scope of each claim separately.

To assist you in confirming that you need a license, we provide illustrative examples of infringing systems below in the form of a brief set of fact checklists that you can use to determine if your system is one for which you should contact us about a license. If you can answer "YES" to each question under any of the scenarios A through C below, then you should contact us promptly.

**A. Internetworking of Scanner/MFP and Email (SMTP, IMAP, POP3)**

**Yes  No**

☐   ☐   1.  Does your company use document scanning equipment that is network addressable (*i.e.*, it has an IP address and can communicate on your network);

☐   ☐   2.  Does your company use Microsoft Exchange/Outlook, Lotus Domino/Notes or a comparable system for company email;

☐   ☐   3.  Are at least some of your employees' email addresses loaded into the scanner, so that you can select to whom you wish to send a scanned document by email; or, alternatively, can you manually input an employee's email address into the scanner to whom you wish a scanned document to be sent; and

☐   ☐   4.  Can you cause your scanner to transform your paper document to a .pdf file, and have it automatically transmitted to one or more of your employees by email.  By automatically, we mean that pressing a "Start" or "Go" button instigates both the copying of the document and the automatic transmission of the document to its intended destination (such as a Microsoft Outlook email inbox).

**B. Scanner/MFP and Sharepoint (HTTP and HTTPS)**

☐   ☐   1.  Does your company use document scanning equipment that is network addressable (*i.e.*, it has an IP address and can communicate on your network);

☐   ☐   2.  Does your company use Microsoft Sharepoint; and

☐   ☐   3.  Is your scanner equipment configured so that you can scan a document and automatically transmit it to a Sharepoint site address.

**C. Scanner/MFP and FTP/SFTP Site**

☐   ☐   1.  Does your company use document scanning equipment that is network addressable (*i.e.*, it has an IP address and can communicate on your network);

☐   ☐   2.  Does your company use File Transfer Protocol and/or Secure File Transfer Protocol; and

☐   ☐   3.  Is your scanner equipment configured so that you can scan a document and automatically transmit it to an FTP or SFTP site.

Our research, which includes review of several marketplace trends and surveys, including various IDC reports, Infotrends reports and market share analyses, as well as a recent survey of an IT service company about the internal network environments of its clients, has led us to the conclusion that an overwhelming majority of companies like yours utilize systems that are set up to practice at least one of scenarios A through C above.  Indeed, such practices are now standard in many industries.  As a common example, our investigation has shown that most businesses have migrated to the usage of corporate email servers running Exchange or Lotus Domino/Notes and have further incorporated digital scanning into their workflows.



As your organization almost certainly uses in its day-to-day operations digital copier/scanner/multifunction equipment which is interfaced to a separate central office computer (an office network), so that digital images may be scanned and transmitted to one or more destinations such as email accounts and other applications, you should enter into a license agreement with us at this time.

If you believe you are in the unusual position of not having a system that can practice any of scenarios A through C outlined above, or otherwise avoids the requirements of the patent claims, please contact us so we may discuss means for confirming that. Upon appropriate confirmation, we would agree you have no need of a license and would not intend to pursue the matter further unless circumstances changed in a way to warrant reopening a reasonable inquiry. The materials we likely would require could include copies of the user manuals for your office copying/scanning equipment, along with the IP addresses and 2012 daily activity logs for each of them, as well as the registry of each of the email servers and file servers used in your company. These would allow us to determine whether we agree with your assessment. Of course, we are willing to treat any information you provide us as confidential and we will sign a non-disclosure agreement to that effect if you so desire. We should note that the examples A through C above are not an exhaustive list of the systems which may infringe, and that it may be determined that your system nevertheless requires a license even if it does not exactly fit one of the more common examples we have provided in this letter. However, when you provide us with the above information, we will be able to make that determination and explain that situation to you, if it exists.

You should know also that we have had a positive response from the business community to our licensing program. As you can imagine, most businesses, upon being informed that they are infringing someone's patent rights, are interested in operating lawfully and taking a license promptly. Many companies have responded to this licensing program in such a manner. Their doing so has allowed us to determine that a fair price for a license negotiated in good faith and without the need for court action is a payment of $1,000 per employee. We trust that your organization will agree to conform your behavior to respect our patent rights by negotiating a license rather than continuing to accept the benefits of our patented technology without a license. Assuming this is the case, we are prepared to make this pricing available to you.

As part of our licensing program, we have received certain common inquiries that frequently are asked. In anticipation that you might have some of those same questions, and with an interest in addressing those sooner than later, we wish to provide some additional information as well.

One common question we have been asked is why we are not contacting the manufacturers of the scanning equipment or application software directly. The answer is our patent rights do not claim any scanning equipment, network file systems, FTP or Sharepoint sites, or email systems *alone*. Instead, our patent rights are addressed to end user enterprise systems which use network scanners or MFPs interoperably with other software/systems in order to practice the patented solution. As such, we would not, and do not, expect any manufacturer of a particular piece of equipment or software to accept any responsibility for the infringement created by the overall system, of which their product is only a part. Further, we expect that if you review your own agreements with these manufacturers, you will find that likewise they do not owe you any duty to indemnify you for situations where you combine a piece of equipment or software with other equipment or software to make a larger, more integrated (and useful) system.

Another common question is whether (or why) you have been singled out to receive this letter, as you may believe there are other companies like you that have not been contacted. Our response to that is to assure you that we have an ongoing vigorous licensing program that is being handled as promptly as possible, and that we fully expect to address the companies who are in need of a license. That said, your infringement of the patent rights is not justified by the infringement by others, as we are sure you understand.

We do invite you to consult with a patent attorney regarding this matter. Patents are exclusive property rights granted by law, and there can be serious consequences for infringement. Infringers who continue to infringe in the face of an objectively high risk of infringement of a valid patent can be forced to pay treble (triple) the actual damages, as well as the patent owner's litigation costs, including all attorney's fees.

Please let us hear from you within two weeks of the date of this letter, so that we may agree with you upon an appropriate license arrangement if one is needed. You may answer by contacting us by mail, phone, or email at the address provided at the start of this letter. We look forward to hearing from you.

Sincerely,

David Martin
HarNol, LLC

Exhibit B

# FARNEY DANIELS LLP

*Silicon Valley*

*Dallas*

800 South Austin Ave., Suite 200
Georgetown, Texas 78626-5845

www.farneydaniels.com

███████████████████

*Delaware*

*Austin/Georgetown*

*Via First Class Mail*



Re: ███████████████████████

Dear ████████████████

    We write with respect to the patent licensing efforts of our client, EntNil, LLC. This is the third letter you have received on this topic. The first letter, sent to you some time ago, provided a detailed explanation of what our client's patents cover, how you likely have an infringing system and therefore require a license, and provided you with the general terms for such a license. We then wrote you several weeks ago, noting that our client had not received a response from you, and had turned the matter over to us in hopes that we would be able to work out a license agreement. Both letters advised you to seek patent counsel for assistance. As you have not contacted us to explain that you do not have an infringing system, we reasonably can only assume that the system you are using is covered by the patents. In that case, you do need a license.

    Accordingly, if we do not hear from you within two weeks from the date of this letter, our client will be forced to file a Complaint against you for patent infringement in Federal District Court where it will pursue all of the remedies and royalties to which it is entitled. The Complaint is attached, so that you may review it and show it to your counsel. Please note that we reserve the right to modify the Complaint, including adding additional patents, before we file. While our client would like to avoid litigation, it takes its licensing responsibilities seriously, as well as its responsibilities to protect the interests of all the companies who have already taken the proper step of obtaining a license. As stated in both the first and second letters you received, our client has no interest in seeking a license from someone who does not infringe. To reiterate this point one last time, if your company does not use a system covered by the patents, we urge you to contact us to confirm non-infringement so that we may discontinue our correspondence with you and avoid the unnecessary expense associated with a lawsuit.

    In the far more likely scenario that you do need a license, we are prepared to work with you to reach an agreement on reasonable terms, but we must hear from you within two weeks of the date of this letter. Given that litigation will ensue otherwise, we again encourage you to retain competent patent counsel to assist you in this matter. If you have already retained patent counsel, please forward this letter to them and inform us of your choice of counsel so that we may direct all future correspondence to them.

    You may contact me at (512) 508-8481.

                   Sincerely,

                   *Maeghan Whitehead*

                   Maeghan Whitehead

Exhibit C

## IN THE UNITED STATES DISTRICT COURT

EntNil, LLC

                         Plaintiff,

v.

        █████████████████████

                       Defendant.

Civil Action No. _____

**JURY TRIAL REQUESTED**

## COMPLAINT

Plaintiff EntNil, LLC ("EntNil" or "Plaintiff"), by way of Complaint against Defendant ██████████████████████ or "Defendant"), hereby alleges as follows:

### NATURE OF THE ACTION

1.     This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, *et seq.*

### THE PARTIES

2.     Plaintiff EntNil is a limited liability company organized under the laws of Delaware with its principal place of business at 40 East Main Street, #19, Newark, DE 19711.

3.     ██████████████████████████████████████

### JURISDICTION AND VENUE

4.     This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a). Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b&c) and 1400(b).

1

5.     This Court has personal jurisdiction over Defendant for at least the following reasons: (i) ▮▮▮▮▮▮ has, upon information and belief, knowingly and intentionally committed acts of patent infringement at least in this District and (ii) ▮▮▮▮▮▮ regularly does business or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in this District.

## RELEVANT FACTS

6.     This is a case where the Plaintiff owns valuable patent rights through a combination of issued patents and patents pending which cover the Defendant's ability to operate an information technology system within which its employees are able to scan a document into such things as (a) an email attachment, including transmittal of the attachment over a local area network or across the Internet; (b) a digital document file format, transmitted over a local area network or across the Internet, including storage of the document into its network files so that it can be accessed by Defendant's employees through one or more software applications; (c) a digital document, including transmittal of the document to a Sharepoint site or an FTP site. These patent rights are valuable because of the efficiencies they add to the workplace via the fast, reliable transmission of data without the added cost, delay and unreliability of paper-based systems of the prior art.

7.     Defendant obtained this technology by integrating hardware, software and other equipment provided by various companies, none of which individually are accused of infringing the Plaintiff's patent rights. However, the Defendant has brought these diverse elements together into a data management system that infringes Plaintiff's patent rights.

8.     Plaintiff has previously communicated in writing with Defendant about its patent rights, including setting forth its view that Defendant should take a license to one or more of its

2

patents. Defendant has not denied the use of the infringing technology, but has thus far been unwilling to share any of its own business information requested by Plaintiff, and has furthermore failed to cease its illegal theft of Plaintiff's patent rights.

9.      Upon information and belief, Defendant has created and maintains a system for collecting, storing and accessing information.

10.     Upon information and belief, Defendant utilizes a network addressable scanner and or a network addressable multifunction device (each of which is hereby described as an "IP scanner"). The IP scanner is capable of scanning paper into a digital form. Said IP scanner has its own IP address. It is configured so that various employee email addresses may be inputted into it in advance. Said IP scanner also includes a user interface which permits the user to input, *inter alia*, an intended recipient's email address, and then to press a button, which in turn triggers the scanning of paper into a digitally-formatted file that is automatically emailed to the intended recipient's email address. Upon information and belief, such IP scanner is configured to support similar related functionality such as scanning a document into a digital file that it transmitted to a Sharepoint site and/or to an FTP site, where it may be accessed by one or more of Defendant's employees. To be clear, Plaintiff is not alleging or contending that IP scanner equipment alone infringes any patent rights.

11.     Upon information and belief, Defendant utilizes within its IT infrastructure an email system. Upon information and belief, Defendant utilizes Microsoft Exchange and Outlook, which runs on at least one server, in order to aid the process of communicating a digital image from an IP scanner to an intended email destination. Again, Plaintiff is not alleging or contending that these Microsoft products (or servers running them) by themselves infringe any patent rights.

3

12.    Upon information and belief, Defendant utilizes an IP scanner capable of scanning paper into a digital form. Said IP scanner includes a user interface which permits the user of the IP scanner to input, *inter alia*, an intended network file destination, and to then press a button, which in turn triggers the scanning of paper into a digitally-formatted file that is automatically transmitted to and stored within the designated network file destination. To be clear, Plaintiff is not alleging or contending that the IP scanner equipment alone infringes any patent rights.

13.    Upon information and belief, Defendant utilizes Microsoft Windows in a client server configuration, in order to aid the process of communicating a digital image from a scanner/copier to an intended file destination accessible to a file server. Again, Plaintiff is not alleging or contending that these Microsoft products (or server running Microsoft products) by themselves infringe any patent rights.

<u>COUNT I – INFRINGEMENT OF U.S. PATENT NO. 7,477,410</u>

14.    EntNil repeats and re-alleges the allegations of all of the preceding paragraphs as if fully set forth herein.

15.    On January 13, 2009, United States Patent No. 7,477,410 (hereinafter referred to as the "'410 Patent"), entitled DISTRIBUTED COMPUTER ARCHITECTURE AND PROCESS FOR VIRTUAL COPYING, was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '410 Patent is attached as Exhibit A to this Complaint.

16.    EntNil is the exclusive licensee for the field pertinent to the Defendant in and to the '410 Patent, with sufficient rights and interest in the '410 Patent as to have standing to

4



assert all causes of action arising under said patent and the right to any remedies for infringement of it with respect to ▮▮▮▮▮▮▮▮

17.    Upon information and belief, Defendant has in the past and continues to directly infringe at least Claim 8 and other claims of the '410 Patent by making and using in this judicial district and elsewhere in the United States, a data management system possessing all of the elements of at least these claims.

18.    Upon information and belief, Defendant uses at least one network addressable scanner, digital copier or other multifunction peripheral (collectively, "digital copying devices") capable of creating a digital copy of a physical document (e.g., a paper document).

19.    Upon information and belief, Defendant uses one or more central computer(s) or server(s) for sharing access to information (collectively, Defendant's "file server") among desktop computers and/or other computers used by Defendant's employees (collectively, "client computers") and/or mobile devices used by Defendant's employees such as Blackberry® devices and other smartphones.

20.    Upon information and belief, Defendant uses one or more central computer(s) or server(s) running corporate electronic email software (collectively, Defendant's "email server").

21.    Upon information and belief, Defendant's file server and its email server are each connected to data stored in an electronic storage medium ("Defendant's data storage") such that certain of Defendant's data located in Defendant's data storage is accessible to Defendant's file server and/or email server.

22.    Upon information and belief, Defendant uses memory in its file server and/or email server which stores software permitting electronic communication between Defendant's file server and at least one of the Defendant's digital copying devices.

5

23. Upon information and belief, Defendant uses memory in its file server and/or email server which stores software permitting electronic communication between Defendant's file server and at least one of the Defendant's client computers.

24. Upon information and belief, Defendant uses memory in its file server and/or email server which stores software permitting electronic communication between Defendant's email server and at least one of the Defendant's digital copying devices.

25. Upon information and belief, Defendant uses memory in its file server and/or email server which stores software permitting electronic communication between Defendant's email server and at least one of the Defendant's client computers.

26. Upon information and belief, Defendant uses software operated on or in conjunction with its file server and/or its email server and/or its data storage to replicate and transmit one or more digital copies of physical documents such as paper documents to one or more servers or client computers.

27. This replication and transmission occurs as a result of a user-command communicated through a graphical user interface (GUI), without any modification of any of Defendant's client computers, and without any modification of Defendant's software source code.

28. As a consequence of the infringement of the '410 Patent by the aforesaid Defendant, Plaintiff is entitled to recovery of past damages in the form of, at a minimum, a reasonable royalty.

29. Defendant's conduct since at least Defendant's receipt of the first communication from Plaintiff to Defendant regarding the '410 Patent also has induced infringement and/or contributed to infringement by others. For this indirect infringement, Plaintiff also is entitled to recover damages in the form of, at a minimum, a reasonable royalty.

6



30.     Moreover, as a consequence of the prior communication of patent rights by Plaintiff to Defendant, combined with Defendant's failure to cease and desist from further infringement in the face of the objective risk of infringement, the infringement is willful, giving rise to Plaintiff's claims for trebling of the damages in this case, as well as to Plaintiff's claims that this is a case where Defendant should reimburse Plaintiff for its attorneys' fees and other costs of litigation pursuant to 35 U.S.C. Section 285.

### COUNT II- INFRINGEMENT OF U.S. PATENT NO. 7,986,426

31.     EntNil reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

32.     On July 26, 2011, U.S. Patent No. 7,986,426 (hereinafter referred to as the "'426 Patent"), entitled DISTRIBUTED COMPUTER ARCHITECTURE AND PROCESS FOR DOCUMENT MANAGEMENT, was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '426 Patent is attached as Exhibit B to this Complaint.

33.     EntNil is the exclusive licensee for the field pertinent to the Defendant in and to the '426 Patent, with sufficient rights and interest in the '426 Patent as to have standing to assert all causes of action arising under said patent and the right to any remedies for infringement of it with respect to

34.     As a result of the Defendant's scan-to-file and scan-to-email functionality described in the preceding paragraphs, which are incorporated herein in their entirety, the '426 patent is directly infringed by Defendant. The infringement includes infringement of Claim 1.

7

35.    As a consequence of the infringement of the '426 Patent by the aforesaid Defendant, Plaintiff is entitled to recovery of past damages in the form of, at a minimum, a reasonable royalty.

36.    Defendant's conduct since at least Defendant's receipt of the first communication from Plaintiff to Defendant regarding the '426 Patent also has induced infringement and/or contributed to infringement by others. For this indirect infringement, Plaintiff also is entitled to recover damages in the form of, at a minimum, a reasonable royalty.

37.    Moreover, as a consequence of the prior communication of patent rights by Plaintiff to Defendant, combined with Defendant's failure to cease and desist from further infringement in the face of the objective risk of infringement, the infringement is willful, giving rise to Plaintiff's claims for trebling of the damages in this case, as well as to Plaintiff's claims that this is a case where Defendant should reimburse Plaintiff for its attorneys' fees and other costs of litigation pursuant to 35 U.S.C. Section 285.

## JURY DEMAND

38.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, EntNil demands a trial by jury on all issues triable as such.

## PRAYER FOR RELIEF

WHEREFORE, EntNil respectfully demands judgment for itself and against Defendant as follows:

A.    An adjudication that Defendant has infringed the '410 Patent;

B.    An adjudication that Defendant has infringed the '426 Patent;

C.    An award of damages to be paid by Defendant adequate to compensate EntNil for its past infringements of the '410 and '426 Patents and any continuing or future

8

infringement through the date such judgment is entered, including interest, costs, expenses and enhanced damages for any willful infringement as justified under 35 U.S.C. § 284 and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

     D.     A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of Plaintiff's reasonable attorneys' fees; and

     E.     An award to EntNil of such further relief at law or in equity as the Court deems just and proper.

Respectfully submitted,

Dated: _____, 2012     By: _____

                                 *Attorneys for Plaintiff,*
                                  *EntNil, LLC*

9